## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

DEBRA WRIGHT,                           )
                                        )
                    Plaintiff,          )
                                        )
-vs-                                    )        Case No. CIV-23-864-F
                                        )
OGE ENERGY CORP.,                       )
                                        )
                    Defendant.          )

### ORDER

Defendant OGE Energy Corporation (OGE) terminated the employment of plaintiff Debra Wright (Wright) in July of 2022. Subsequently, Wright commenced this action, alleging claims of disability discrimination, failure to accommodate a disability, and retaliation. The claims are brought under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq*., and the Oklahoma Anti-Discrimination Act (OADA), 25 O.S. § 1101, *et seq*. After conducting discovery, OGE has moved for summary judgment, pursuant to Rule 56(a), Fed. R. Civ. P, and LCvR56.1, on Wright's claims. Doc. no. 46. Upon review of the parties' submissions, the court makes its determination.

### *Standard of Review*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. "A fact is material only if it might affect the outcome of the suit under the governing law. And a dispute over a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Bennett v. Windstream Communications, Inc., 792 F.3d

1261, 1265-66 (10th Cir. 2015) (quotation marks and citation omitted).  In deciding whether summary judgment is appropriate, the court views the evidence in the light most favorable to Wright, the non-moving party, and draws all reasonable inferences from the evidence in her favor.  Aubrey v. Koppes, 975 F.3d 995, 1000, 1004 (10th Cir. 2020).

*Relevant Facts*

In August 2018, OGE, an electric utility, hired Wright as an Accountant Associate in its Financial Accounting department.  Wright was responsible for billing third parties other than OGE's electric customers.  She was the sole employee assigned to the "third-party desk," but she performed similar duties and was subject to the same conduct and performance standards as other accountants in the department.  Doc. no. 46-1, ¶ 3; Doc. no. 64-1, ECF p. 9, ll. 18-25.  Jennifer Cook (Cook) was Wright's direct supervisor.

For her 2019 mid-year review and year-end appraisal, Wright received an overall performance rating of "Meets Expectations."  However, in the 2019 year-end appraisal, Cook gave Wright a "Meets Expectations Minus" rating with respect to one of the goals Wright had laid out for her position:

> Develop a better understanding of processes regarding City Owned Poles [COP] and get an Edit Report that shows the progress of work orders from the time reported to reimbursements by the cities or sent to OGE property damage.  Schedule a meeting with parties involved in the process . . . Find someone to set-up Edit Report for COP. Write procedures for processing poles and editing the report.  Following and tracking poles monthly reporting.

Doc. no. 46-9, ECF p. 3.

Cook commented:

> Debra has organized a couple of meetings and came up with some questions to ask.  These meetings have shed

2

> light on some issues that still need to be resolved. While
> I think Debra has definitely gained more knowledge on the
> [COP] there is still a lot of work to be done. There are
> some issue[s] that we need to continue to work through
> with the members at [M]etro and our processes. I am
> confident that Debra will continue to work on this process
> and make it better.

*Id.*[1]

For Wright's 2020 mid-year review, Cook rated her overall performance as "Meets Expectations."

Around the last quarter of 2020, Wright began to experience back pain. After Wright told Cook about her "back issues" and that her pain was slowing her down, Cook gave Wright her 2020 year-end appraisal. Doc. no. 64-3, ¶¶ 4 and 5.[2] In that appraisal, Cook rated Wright's overall performance as "Near Expectations."

Unlike the year-end appraisal for 2019, Cook did not give any rating as to Wright's individual goals. With respect to Wright's goal regarding COP, Cook commented:

> Goal was to document and improve the [COP] process.
> Debra has worked with members at Metro to try to come
> up with a process to get information and to capture as
> many opportunities to get reimbursed for these damaged
> poles. There was some progress made but it is still a work
> in progress. Since we had to work remote for several
> months we have tried even more to get processes
> electronic. This has been a struggle for Debra to move to

---

[1] From the record, it appears the COP are poles owned by cities that have been repaired or replaced by OGE and the cities are billed for the work performed by OGE. Plaintiff admitted that OGE loses revenue if the COP "doesn't get billed." Doc. no. 46-5, ECF p. 12, ll. 2-8.

[2] In its reply, OGE contends Wright's affidavit testimony should be disregarded as "self-serving." However, self-serving testimony is competent to oppose summary judgment, so long as it is based upon personal knowledge and sets forth facts that would be admissible in evidence. *See*, Greer v. City of Wichita, Kansas, 943 F.3d 1320, 1325 (10th Cir. 2019); Sanchez v. Vilsack, 695 F.3d 1174, 1180 n. 4 (10th Cir. 2012). The court is satisfied Wright's affidavit testimony is based on personal knowledge and sets forth facts that would be admissible in evidence.

that. She has setup a spreadsheet recently that is still being worked on. This is a process that if left alone can get to be problematic. I would like to make sure Debra dedicates time to this process weekly and continue to try to improve and not let this get behind.

Doc. no. 46-10, ECF p. 2.

In the year-end appraisal, Cook also commented,

Debra has worked with Tre [Watson] and [Katie Rattan] and more recently Adam [Myrick] to try to train to be back up for her when she is out. Her desk is very specialized and different that anything others do in our group. I would like to see if we can possibly change things around and share some duties with the backup so more knowledge can be transferred for when Debra is out. This would also allow more time for Debra to work on the items that aren't so routine in her position such as [COP] and edit reports. I don't feel like we have someone that can step in and cover while she is gone so we will work on that for the next year as well.

*Id.*, ECF p. 3.

She further commented,

Debra has a tendency to put off the more non-routine parts of her job. If it is something that she doesn't do on a daily basis those can be put to the side for a long time. I would like to see her address those task[s] in a more timely manner and seek help if she needs it. Something this year we have learned is we need to have things in a more electronic format. We all need to access the information in order to help each other out or get to information if someone is out. This is area that Debra can improve on. We can have our paper but for others to help and get the information it needs to also be in an electronic format.

*Id.*, ECF p. 4.

4

Cook met with Wright regarding the 2020 year-end appraisal, and they discussed what Wright could do to make sure she was meeting expectations in the future. According to Wright, Cook did not tell her that she was behind on COP or that she was doing anything wrong. Cook did tell her that she understood Wright was having a difficult time finishing the COP process because other departments were not providing Wright with the information she needed. Also, Cook told Wright she needed to do two things: (1) make all her notes electronic, and (2) complete edit reports more quickly. Wright made her notes electronic, and tried to do the edit reports more quickly, but it became more difficult when she started to become sick. Wright had not missed a deadline with the edit reports, but Cook wanted her to work faster. Doc. no. 64-3, ¶¶ 13-14.

On January 27, 2021, Cook sent an email to Wright attaching a "General Ledger Accounting Expectations 3rd Party Billing Accountant" ("Expectations Document"). Doc. no. 46-1, ECF p. 8. It set forth expectations with respect to the tasks of COP, Edit Reports, Daily Work Log, Aging AR (accounts receivable), Highway Relocation, Refunds, Reconciliation, and certain miscellaneous matters. Cook stated that by signing the document, Wright would be acknowledging that she and Cook reviewed the document together and that she understood what the expectations of her position included. Wright signed the document.

According to Wright, Cook gave her similar documents about once a year to make sure she had a full list of her duties because they sometimes changed, and the job description for her position did not include specific duties Cook wanted her to perform.

Wright's back pain began to worsen, and she started seeing a chiropractor at the end of March 2021. She received treatment regularly from the end of March until the middle of May 2021. Wright informed Cook about her appointments, the

majority of which were during the workday.  In addition to her chiropractor appointments, Wright sought medical care from her primary care physician.

In March or early April 2021, Wright felt like "she started to get behind on her deadlines because she was in so much pain and going to the chiropractor a lot." Doc. no. 64-3, ¶ 19.  Wright asked Cook if someone could help her temporarily, and Cook said she needed to do her job without help.  Cook also told Wright she "should look into medical leave if [she] needed help."  *Id.*

Like other employees in the Financial Accounting department, Wright worked remotely in 2020 and the first part of 2021.  In May of 2021, Cook consulted with Human Resources (HR) Operations Specialist Aldo Gonzalez (Gonzalez) concerning Wright's job performance.   Gonzalez recommended putting Wright on a Performance Improvement Plan (PIP).   However, in lieu of a PIP, Cook revoked Wright's "Alternative Work Schedule" effective May 17, 2021.  Cook memorialized the decision in a Record of Member Discussion (ROMD) dated May 10, 2021.  The ROMD stated that Wright's work schedule was being revoked "due to a decline in [her] productivity and the quality of [her] work."  Doc. no. 46-13, ECF p. 9. According to Cook, the observable decline in performance related to the "Daily Receipts Log," the "City Owned Poles," and an "Aging AR Meeting."  *Id*.  Also, Cook stated that Wright had not updated her edit reports.  Cook required Wright to report to the workplace for a five day, eight hours work week.  Cook acknowledged that Wright had mentioned she had "a lot going on personally" and stated this may be the reason why she was not meeting performance expectations.  *Id*.

Cook did not return to the office to assist Wright.  She continued to work remotely.  In an email to Gonzalez, Cook indicated that her purpose for having Wright come into the office was to remove "the distractions."  Doc. no. 64-8, ECF p. 1.  She felt Wright was not getting her work done because she was "either [too] distracted at home or she [was] ill and unable to work.  Either way work [was] not

getting done" and she felt Wright "need[ed] to be coming into the office to get her work done." *Id.* at ECF p. 4.

Wright had not talked with Cook about any personal issue other than her medical condition and doctor appointments. Doc. no. 64-3, ¶ 21. During their ROMD meeting, Wright told Cook that she was behind on some tasks because she "had been out at doctor's appointments and trying to figure out what was wrong with her back." Doc. no. 64-3, ¶ 9. According to Wright, Cook "seemed frustrated" that Wright had been away so much from work. *Id.* Cook told Wright that "I know you can work fast" and accused her of taking too much sick leave. Cook also told her that if she "wanted to keep [her] job [she] needed to talk to HR about FMLA or other medical leave." Doc. no. 64-3, ¶ 22.

In response to the ROMD, Wright commented:

> I've never used <u>all</u> my sick leave and I have constantly been told I'm not working when I'm working and to contact HR [] to save my job. I feel awful about being ill and I've gotten better and almost at 100%. I'm so disappointed with how I've been treated[.]

Doc. no. 46-13, ECF p. 10 (emphasis in original).

Cook responded to Wright's comments stating that she had let Wright "know options available to her if she needs to take some time to get better. HR is there to assist if special accommodations need to be made[.]" Doc. no. 46-13, ECF p. 11.

Wright requested a meeting with Gonzalez. Around the same time, another OGE accounting employee, Patience Yandell (Yandell), sent an email to Cook offering to make herself available to help Wright "get caught up." Doc. no. 64-8, ECF p. 10. Cook sent an email to Gonzalez asking if it would be "better to get her caught up and then go from there." *Id.* at ECF p. 11. Gonzalez recommended that Cook propose a plan to help Wright. *Id.*

On May 18, 2021, Cook sent Wright an email proposing a plan to "assist in getting [her] caught up." Doc. no. 46-15, ECF p. 2. As part of the plan, Cook suggested that she, Yandell, and another OGE accounting employee, Adam Myrick, assist Wright by reviewing and processing invoices related to the COP. *Id*. at ECF p. 3.

On May 20, 2021, Cook and Wright met and discussed the process of "getting caught up" and what it would look like. Cook memorialized that discussion in an email on May 24, 2021. Cook stated that Wright would process invoices three days a week and review edit reports and aging receivables. Cook would get a "team together to get COP caught up." Doc. no. 46-16. In the email, Cook also approved Wright's vacation from May 31, 2021 through June 4, 2021.

Beginning on May 31, 2021, Wright took vacation time to seek medical opinions related to her back issues.

In the evening on Sunday, June 6, 2021, Cook emailed Wright to outline the actions she and the other accounting staff had taken while Wright was out on vacation.

The next day, June 7, 2021, Wright did not return to work. During a medical appointment, Wright's doctor discovered she had a heart murmur and ordered a transthoracic echocardiogram. The test results indicated a heart issue.

On June 22, 2021, Wright's son contacted Cook and told her that his mother was in the emergency room with a heart issue. Shortly thereafter, on June 30, 2021, Wright had surgery to replace her aortic valve and mitral valve. Subsequently, Wright had a pacemaker installed. Doc. no. 47, ECF p. 4. She was also prescribed heart medication.

About a month later, Cook signed off on a Wright's 2021 Mid-Year Review, which gave Wright an overall performance rating as "Below Expectations." With respect to that rating, Cook commented that Wright "has been ill and out on FMLA.

I'm unable to fully evaluate her performance at this time."  Doc. no. 64-10.  None of the individual goals for which a rating was given by Cook were "Below Expectations."  Cook commented that the stated goal relating to COP was done by others on the team.  For the same evaluation period, Cook rated Yandell, Rattan, and Myrick, who did not have medical conditions, as "Meets Expectations" even though all had one goal for which they were rated "Below Expectations."  Cook also rated Yandell, Rattan, and Myrick higher than Wright for the exact same level of performance on the "Errors or SOX deficiencies" goal.

On September 14, 2021, Anastasia M. Medved, APRN, cleared Wright from "every surgery restriction – [she] can drive.  [She] can lift, push, or pull greater than 10lb."  Doc. no. 47, ECF p. 5.

Although Wright was cleared from surgery restrictions related to her heart, she had also suffered a surgery-related complication involving her right hand.  Due to that complication, Wright remained off work.

On November 1, 2021, Cook signed off on Wright's 2021 Year-End Review, which gave Wright an overall performance rating as "Below Expectations."  Cook commented: "N/A due to be[ing] out of the office on [short term disability] for ½ of the year.  Unable to grade on performance due to her being out of the office."  Doc. no. 46-20.

On January 3, 2022, Ghazi M. Rayan, M.D., Wright's hand doctor, signed a "Return to Work Slip," stating that Wright may return to work "Full Duty (No Restrictions)."  Wright returned to work on January 5, 2022.  Doc. no. 46-22.

While she was on leave, Wright's duties were performed by Cook, Dawson Watson (Watson) and Sabrina Dillard (Dillard).  On January 11, 2022, Cook sent an email to Wright advising that she wanted Watson and Dillard to continue to oversee Wright's duties, and she and Wright would start training the following week.  Cook

informed Wright that "things [] were changed" and she wanted to start Wright "fresh with those processes." Doc. no. 46-23.

Wright advised Cook that she was having memory and dizziness issues. She felt she was thinking slower than normal. Wright attributed the issues to her heart medication and told Cook she would be able to get off the medication in about three months. She advised Cook she needed time adjusting and a slower pace. She had asked about Watson and Dillard continuing to help her. Cook reminded Wright that she had returned to work with no restrictions.

On a weekend in January of 2021, Wright went the emergency room because of a high blood pressure issue. Wright advised Cook of the incident. Cook had noticed that Wright was "struggling," "she was . . . rubbing her hand" and was "just exhausted," and told Wright to talk to HR about a part-time position. Doc. no. 64-1, ECF p. 71, ll. 2-12.

On January 21, 2022, Gonzalez met with Wright. They discussed the possibility of part-time employment. Gonzalez informed Wright she would not receive any benefits in a part-time position, and Wright needed the benefits due to her medical condition. Gonzalez also told Wright that her position was not a part-time position.

According to Gonzalez, he discussed with Wright the ADA reasonable accommodation process and overview, and asked he if she needed an accommodation, to which she said "no." Doc. no. 46-13, ECF p. 13 (emphasis omitted). Wright denied in deposition that he asked her if she needed an accommodation. Doc. no. 64-4, ECF p. 41, l. 24-25, ECF p. 42, ll. 1; ll. 9-11.

On January 24, 2022, Cook sent an email to Gonzalez asking if he had spoken to Wright because she had called in sick and stated her doctor said her symptoms were probably related to anxiety. Gonzalez responded that he had spoken to Wright,

and she did not request a reasonable accommodation and was not interested in pursuing a temporary part-time accommodation.

According to Wright, she told Gonzalez about complications from heart surgery, including the memory and dizziness issues. She also told him that she had asked Cook for more time to get her job duties done and had asked for more help in getting them done. Doc. no. 64-3, ¶ 25; doc. no. 64-5, ECF p. 13, ll. 17-25.

After her return to work, Wright continued to receive medical care, and she had to take off work weekly to receive that medical care. According to Wright, Cook "seemed frustrated" about that. Doc. no. 64-5, ECF p. 12, ll. 23-25.

On January 25, 2022, Cook sent an email memorializing an earlier conversation regarding Wright's tasks and corresponding deadlines. Cook explained that "everything [was] caught up" with the exception that they had not "had a formal aging AR meeting" which Cook stated that she would handle that week, but that Wright would handle it next month. Cook stated that Wright would be responsible for the remainder of the duties effective that day. Doc. no. 46-21, ECF p. 3. Cook stated that if Wright was unable to meet the expected deadlines, she was to reach out to Cook immediately. The email included COP in the tasks list, with a weekly deadline.

Shortly thereafter, on February 10, 2022, Cook sent an email to Wright to "make sure we are on the same page as to who is going to take over what for now." Doc. no. 46-25. The email stated that Watson would be handling "COP invoices and process" and "Tinker invoices." *Id*. at ECF p. 3. Wright was to handle "Daily Receipts Log," "Salvage," "RECS and misc invoices," "Edit Reports," and "Aged Receivables." Wright responded that she "really appreciate[ed] more time to adjust and perform these duties to the best of my ability. I feel like in a month or so I'll be ready to do more." *Id*. at ECF p. 2.

Cook also allowed Yandell to help Wright with her workload and tasks. On March 10, 2022, Cook sent Wright an email stating that she was going to start scheduling meetings involving her, Wright, and Yandell to go over Wright's schedule. She also stated that she would schedule time to go over the COP spreadsheet. She thought it was "time to move that [Wright's] way." Doc. no. 46-26.

Wright had weekly training from Cook on the COP. According to Wright, the training was "a big part of March" 2022. Doc. no. 64-4, ECF p. 54, ll. 14-15.

In March of 2022, Wright advised Cook that she was not able to get off her medication, at least for a few months. Cook responded: "How long is this going to last," or "Is this ever going to end[.]" Doc. no. 64-5, ECF p. 26, ll. 20-25, ECF p. 27, ll. 1-3. Wright replied that she was "upset, too" about being on the medication. *Id*. at ECF p. 27, ll. 4-10.

On April 4, 2022, Cook placed Wright on a PIP. The PIP addressed four areas for performance improvement: (1) COP; (2) edit reports; (3) aging receivables; and (4) salvage billing. Salvage billing "was not originally spelled out" in the Expectations Document given to Wright in January of 2021. Doc. no. 64-12. With respect to each area of performance mentioned, the PIP outlined: (1) the expected behavior; (2) a step-by-step plan to meet the stated goals; and (3) a plan for Cook to assist Wright in meeting the goals outlined in the PIP at a "Meets Expectations" level. The PIP stated that Wright must make the necessary improvements as outlined in the document and maintain a level of improvement by June 30, 2022. If the necessary improvements in work performance were not met and sustained, as outlined in the document, then "further action, up to and including termination" would result. Doc. no. 46-27.

Prior to the PIP, Wright had not been required to work on the COP process. She had been in training. Wright gave comments in rebuttal to the PIP. She was "in

disagreement" with how the PIP had "been handled." She questioned why she was receiving the PIP when she just started the COP process, and she had been doing the other listed duties "with very little questions or concerns." Doc. no. 46-28. Wright stated that she had written an email on March 21, 2022, asking for any concerns about things being completed, and she had received no response to that email.

The PIP meeting was attended by Gonzalez and Cook's supervisor, Carrie Scribner (Scribner). Before the meeting, Wright told Scribner she had asked Cook for help with her workload because her heart medication was affecting her memory and making her dizzy. She said she hoped to be off the medication in three months. Scribner responded that HR had said Wright had no restrictions, and "we are 'going full speed ahead.'" Doc. no. 64-3, ¶ 29.

Cook met with Wright during the PIP period. On May 5, 2022, Cook sent an email to Wright recapping their discussion at a meeting on May 3, 2022, which meeting Wright had instigated. Cook stated that the COP spreadsheet was to be updated on a weekly basis, including new orders, status on all outstanding orders, the "cost from the kob1 report," and traffic control. In her email, she recognized that Wright did not have access to the traffic control and agreed to update that for her weekly until Wright was able to get access. Doc. no. 46-30.

On June 3, 2022, Cook sent an email to Wright to follow-up a conversation on June 1, 2022 and to clarify some things. She wanted the COP to be updated weekly, and Wright needed to process more than 2-3 poles a week. She mentioned that if it "comes to the end (deadline of June)," and Wright needed some help, they could get some help. Her intent was to offer help at the end if the volume got to be large but not for someone to take over the invoice of COP. Cook also clarified that she expected items that "come out of the [AR] meeting" to be "addressed in that same month of the meeting." Doc. no. 46-31.

13

On June 20, 2022, Cook sent an email to Wright that discussed not getting behind on regular invoices while working on COP.  Wright admitted that she fell behind on the regular invoices because of working the COP.  Cook mentioned that time management was the biggest part of the third-party desk.  She noted that Wright had updated the edit report but got distracted and never sent the follow-up emails on the edit reports.  Cook stated that Wright should have finished the emails.

On July 18, 2022, Cook and two HR personnel met with Wright and told her she did not meet the expectations set forth in the PIP.  Cook specifically cited the COP as one of the reasons why Wright failed to meet expectations.

On July 25, 2022, OGE terminated Wright's employment.  The reason for the termination according to the "Member Profile for Termination" was that Wright "failed to meet the performance expectations outlined in a Performance Improvement Plan initiated on 4/4/2022 and closed on 6/30/2022."  Doc. no. 46-4.

The profile also set forth Wright's annual performance review ratings, which included the "Below Expectations" rating received by Wright in 2021 as grounds to support termination.  Scribner testified that the rating was used as justification for the termination.

Until she was terminated, Wright continued to ask for help with her job duties and deadlines because of her heart issues and her medication.

*Analysis*

The parties do not dispute the court analysis of Wright's failure-to-accommodate and disability discrimination claims under the ADA applies to those claims under OADA.  As to the retaliation claim, OGE argues that the OADA recognizes no such claim.  The court will address the failure-to-accommodate and disability discrimination claims first.

<u>Failure to Accommodate Disability Claim</u>

"The ADA prohibits a 'covered entity' from discriminating 'against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" <u>Norwood v. United Parcel Service, Inc.</u>, 57 F.4th 779, 786 (10th Cir. 2023) (quoting 42 U.S.C. § 12112(a)). "To 'discriminate against a qualified individual on the basis of disability' includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer].'" <i>Id.</i>

Under Tenth Circuit precedent, a plaintiff must show four elements to establish a prima facie failure-to-accommodate claim: (1) she was disabled; (2) she was otherwise qualified; (3) she requested a plausibly reasonable accommodation; and (4) defendant refused to accommodate her disability. <u>Aubrey</u>, 975 F.3d 1005. If the plaintiff establishes a prima facie claim, the burden shifts to the defendant to present evidence either "conclusively rebutting one or more elements of plaintiff's prima facie case" or "establishing an affirmative defense." <u>Norwood</u>, 57 F.4th at 786 (quotation marks and citations omitted). If defendant does either, summary judgment in defendant's favor will be appropriate unless the plaintiff presents evidence establishing a genuine dispute regarding the affirmative defense or rehabilitates any challenged elements of her prima facie claim sufficiently to establish a genuine dispute of material fact as to such challenged elements. <u>Aubrey</u>, 975 F.3d at 1005-06.

Prima facie claim

In its motion, OGE challenges Wright's ability to show all elements of the prima facie claim.  Upon review, the court finds Wright has proffered sufficient evidence to raise a genuine issue of material fact as to each prima facie claim element.  Because defendant has not proffered sufficient evidence of an affirmative defense or sufficient evidence to conclusively rebut any challenged element of the prima facie claim in its motion papers, the court concludes that summary judgment is not appropriate on the failure-to-accommodate claim.

a. Disabled

The ADA defines disability as "a physical or mental impairment that substantially limits one or more major life activities," "a record of such impairment" or "being regarded as having an impairment."  42 U.S.C. § 12102(1)(A)-(C). Although OGE challenges whether Wright properly alleged in the complaint that she has a record of impairment or was regarded as having an impairment, the court need not address the issue.  Wright has proffered medical records and other evidence which show she underwent open heart surgery to replace her aortic and mitral heart valves, had a pacemaker permanently implanted, and was prescribed medication for her medical condition.  Viewing the record evidence in a light most favorable to Wright, the court concludes that a reasonable jury could find she has a physical impairment that substantially limits one or more major activities.  *See*, Yinger v. Postal Presort, Inc., 693 Fed. Appx. 768, 773 (10th Cir. 2017) (finding reasonable jury could conclude an individual with a heart condition requiring him to have a pacemaker in order to live had a physical impairment that substantially limits one or more major life activities) (unpublished decision cited as persuasive pursuant to 10th Cir. R. 32.1(A)); *see also*, 29 C.F.R. § 1630.2(h)(1) (defining physical impairment as "[a]ny physiological disorder or condition . . . or anatomical loss affecting one or more body systems, such as . . . [the] cardiovascular [system]"); 29 C.F.R.

§ 1630.2(i)(1)(i) and (ii) (defining "major life activities" under the ADA to include "learning . . . concentrating, thinking" and "[t]he operation of a major bodily function, including . . . circulatory, cardiovascular . . . [and] the operation of an individual organ within a body system."); 42 U.S.C. § 12102(4)(E)(i) ("The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures[.]").

    b. <u>Otherwise Qualified</u>

Under the ADA, "qualified individual" is defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "[E]ssential functions" of a position means "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n). It "does not include the marginal functions of the position." *Id*. "The employee bears the burden of showing her ability, with or without reasonable accommodation, to perform the essential functions of her job." <u>Unrein v. PHC-Fort Morgan, Inc.</u>, 993 F.3d 873, 877 (10th Cir. 2021). "But it is the employer who bears the burden of demonstrating that a job function is essential because, after all, the employer is in the best position to do so." *Id*.

The essential-functions inquiry is a "factual inquiry in which courts must give consideration to the employer's judgment as to what functions of a job are essential[.]" <u>Unrein</u>, 993 F.3d at 877 (quotation marks and citation omitted). In addition to the employer's judgment, factors that may assist the court in determining which functions are essential include: "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job;" "[t]he amount of time spent on the job performing the function;" "[t]he consequences of not requiring the incumbent to perform the function;" "[t]he work experience of past incumbents in the job;" and

"[t]he current work experience of incumbents in similar jobs." 29 C.F.R. § 1630.2(n)(3).

In its motion, OGE argues that Wright cannot show she is a qualified individual because the evidence shows that despite training and coaching—both before and after her heart surgery—Wright could not perform the essential functions of her job. Although the parties dispute whether OGE's Rule 30(b)(6) corporate representative's declaration testimony, which is not based on personal knowledge, is sufficient for summary judgment purposes to establish that the tasks enumerated in the Expectations Document (which include the COP) are essential functions of the Accountant Associate position, the court concludes that it need not address that issue. Based on all the other record evidence before it, the court concludes that no reasonable jury could conclude that those tasks, and specifically, the COP, were not essential functions of the Accountant Associate position. This is true even though, as pointed out by Wright, the written description of her position, when she was hired, did not include those tasks.

Wright argues that summary judgment is not appropriate, even if the tasks, including the COP, were essential functions of her position, because after her requests for accommodation, OGE did not engage in an interactive process to determine whether the requested accommodations might have worked to allow Wright to perform the essential functions. Wright argues that OGE's failure to engage in the interactive process, after she made her requests, precludes summary judgment. The court concludes that based on the evidence, viewed in Wright's favor, a reasonable jury could conclude that OGE did not engage in the interactive process. However, as the Tenth Circuit recently recognized, "even if an employer does not engage in the interactive process, a plaintiff cannot survive summary judgment unless she 'can *also* show that a reasonable accommodation was possible.'" Freeman v. City of Cheyenne, Case No. 23-8022, 2024 WL 464069, at

* 3 (10th Cir. Feb. 7, 2024) (quoting <u>Smith v. Midland Brake, Inc.</u>, 180 F.3d 1154, 1171-72 (10th Cir. 1999) (en banc) and citing other cases invoking this principle) (emphasis in original).  The court therefore concludes that OGE's failure to engage in the interactive process, alone, does not avoid summary judgment on the "otherwise qualified" element.

Nonetheless, while a close issue (and one that may be revisited again on Fed. R. Civ. P. 50 motion), the court, having reviewed the record evidence in a light most favorable to Wright, concludes that a reasonable jury could find that Wright could perform the essential tasks of her position, including the COP, with reasonable accommodation.  Consequently, the court concludes that a reasonable jury could find that Wright was otherwise qualified.

c.  <u>Requested Plausibly Reasonable Accommodation</u>

A reasonable accommodation "refers to those accommodations which presently, or in the near future, enable the employee to perform the essential functions of [her] job."  <u>Aubrey</u>, 975 F.3d at 1007 (quotation marks and citation omitted).  These may include "part-time or modified work schedules . . . and other similar accommodations for individuals with disabilities."  <u>Id</u>. (quoting 42 U.S.C. § 12111(9)).

According to OGE, Wright did not request a plausibly reasonable accommodation.  It relies on contemporaneous notes of HR representative, Gonzalez, after meeting with Wright on January 21, 2022, wherein he wrote that he discussed the ADA reasonable accommodation process and overview and asked Wright if she needed an accommodation, to which she said "no."  Doc. no. 46-13, ECF p. 13.  However, Wright has proffered evidence disputing whether Gonzalez asked her about needing an accommodation.  In addition, she has proffered evidence, viewed in her favor, that she requested two accommodations: (1) giving her a lighter

workload by allowing others to assist in performing certain job duties; and (2) giving her more time to complete her job duties.

Whether an accommodation is reasonable is a mixed question of law and fact. Aubrey, 975 F.3d at 1010. To determine whether an accommodation is reasonable, the Tenth Circuit prescribes a burden-shifting formula. *Id*. The employee must show a facially reasonable accommodation. *Id*. If the employee does so, the burden of production then shifts to the employer to present evidence of its inability to accommodate. *Id*. The employer must show special circumstances that demonstrate undue hardship in the particular circumstances. *Id*. If the employer presents such evidence, the employee has the burden of coming forward with evidence concerning her individual capabilities and suggestions for possible accommodations to rebut the employer's evidence. *Id*.

Based on the evidence before it, viewed in Wright's favor, the court concludes that Wright's request for lighter workload by allowing others to assist her in performing certain job duties and her request for more time to complete her job duties are facially reasonable. The court recognizes that under Tenth Circuit precedent, "[a]n employer is not required by the ADA to reallocate job duties in order to change the essential function of a job . . . An accommodation that would result in other employees having to work[] harder or longer hours is not required." Milton v. Scrivner, Inc., 53 F.3d 1118, 1125 (10th Cir. 1995). However, Wright has presented evidence through OGE's Rule 30(b)(6) witness that it would have been reasonable to accommodate Wright by allowing others to perform some job duties for at least six months. And it is not clear from the evidence before the court whether such an accommodation would have resulted in other employees having to work harder or longer hours. Cook had indicated in Wright's 2020 year-end appraisal that she wanted trained backup for Wright's position to share her duties which would give her time to do the COP and edit reports. Further, Wright has presented evidence

20

through OGE's Rule 30(b)(6) witness that it would have been reasonable to accommodate Wright with more time to complete her job duties. The court therefore concludes that Wright has proffered evidence sufficient to raise genuine issue of material fact as to whether she requested plausible reasonable accommodations.[3]

In its papers, OGE has not proffered evidence sufficient to raise a genuine issue of material fact as to its inability to accommodate the facially reasonable accommodation requests. Because Wright has proffered evidence which, if credited, would indicate that she requested facially reasonable accommodations and OGE has not proffered evidence to raise a genuine issue of material fact as to its inability to accommodate the facially reasonable accommodation requests, the court concludes that Wright has raised a genuine issue of material fact as to whether she requested plausible reasonable accommodations.

    d.  <u>Refused to Accommodate Wright's Disability</u>

Despite the court's finding that Wright has raised a genuine issue of material fact that she requested plausible reasonable accommodations, OGE argues that it in fact accommodated Wright's disability. OGE asserts that it made substantial efforts to ease Wright back into her full job responsibilities between January and March 2022. It points out that other employees performed the essential functions of her job for weeks after her return, Yandell was assigned to assist Wright, and Cook provided additional coaching and training.

However, viewing the evidence in Wright's favor, the court concludes that Wright has proffered evidence sufficient to raise a genuine issue of material fact as to whether OGE refused to accommodate her disability. Cook did have other

---

[3] OGE argues in its papers that Wright's accommodation requests are not reasonable because it is not required to wait indefinitely for Wright to begin performing the essential functions of her position. The court, however, concludes that the evidence and inferences from that evidence, viewed in Wright's favor, does not demonstrate that Wright was seeking an indefinite time to perform the essential functions of her position.

employees perform the essential functions of Wright's position immediately after her return. But the evidence, viewed in Wright's favor, would support a finding that Cook had the employees perform the essential functions so that Wright could receive training on the functions due to changes which had occurred while she was on medical leave. A reasonable jury, viewing the record evidence in Wright's favor, could conclude that Wright was not required to perform the COP process until the PIP in April 2022. Moreover, a reasonable jury could conclude that Wright requested plausible reasonable accommodations at the time of and after she was placed on the PIP (and that OGE denied those requests).

Consequently, the court concludes that Wright has proffered sufficient evidence to raise a genuine issue of material fact as to whether OGE refused to accommodate Wright's disability.

_____

Wright has proffered sufficient evidence to raise a genuine issue of material fact as to each of the challenged elements of the prima facie case. Thus, the burden shifts to OGE "to present evidence either (1) conclusively rebutting one or more elements of plaintiff's prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer." Aubrey, 975 F.3d at 1014 (quotation marks and citation omitted). Because the court concludes that defendant has not proffered sufficient evidence of an affirmative defense or sufficient evidence to conclusively rebut any challenged element of the prima facie claim, the court concludes that OGE is not entitled to summary judgment on Wright's failure-to-accommodate claim.

Disability Discrimination Claim

The ADA prohibits an employer, like OGE, from discriminating "against a qualified individual on the basis of disability in regard to . . . discharge of employees." 42 U.S.C. § 12112(a). Unlike her failure-to-accommodate claim, to

22

recover on her disability discrimination claim, Wright must prove that OGE acted with discriminatory animus against her because she had a disability.  <u>Aubrey</u>, 975 F.3d at 1014.

Prima Facie Claim

Where, as here, there is no direct evidence of OGE's discriminatory animus, the court applies the <u>McDonnell-Douglas</u> burden-shifting analysis.[4]  <u>Aubrey</u>, 975 F.3d at 1014.  The first step of the analysis requires Wright "to establish a prima facie case of discrimination by showing (1) that she is disabled within the meaning of the ADA; (2) that she is qualified for the job held or desired; and (3) that she was discriminated against because of her disability."  <i>Id</i>.  (quotation marks, citation and alterations omitted).  Establishing a prima facie case is not onerous.  <i>Id</i>.

The court has already found that Wright has proffered evidence sufficient to raise a genuine issue of material fact as to whether she was disabled and she was otherwise qualified for her position.  With respect to the third element, and mindful that establishing a prima facie case is not onerous, the court concludes that Wright has proffered sufficient evidence to raise a genuine issue of material fact as to that element as well.  <i>See</i>, <u>Aubrey</u>, 975 F.3d at 1014 and 42 U.S.C. § 12112(b)(5)(A) (discrimination includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability); <i>see also</i>, <u>Plotke v. White</u>, 405 F.3d 1092, 1101 (10th Cir. 2005) ("Courts have enumerated a variety of circumstances that can give rise to an inference of discriminatory motive," and a plaintiff may rely "upon the timing or sequence of events leading to [her] termination.").

---

[4] <u>McDonnell-Douglas v. Green</u>, 411 U.S. 792 (1973).

Legitimate Non-Discriminatory Reason for Termination

The second step of the analysis requires OGE to articulate a legitimate, non-discriminatory reason for Wright's termination.  OGE has proffered evidence that Wright was terminated because she failed to meet the expectations set forth in the PIP.  She was not performing her full job duties.  The burden therefore shifts to Wright to show that OGE's justification for firing her was a pretext for disability discrimination.  Aubrey, 975 F.3d at 1015.

Pretext

> A plaintiff may show pretext by demonstrating that the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision.  This is often accomplished by revealing weakness, implausibilities, inconsistences, incoherencies, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence.

Aubrey, 975 F.3d at 1015 (citation omitted).

Viewing the evidence in a light most favorable to Wright, the court concludes that Wright has proffered evidence sufficient to raise a genuine issue of material fact as to pretext.  The evidence includes: (1) Cook giving Wright her first negative overall performance rating after she disclosed her back issues and pain slowing her down,[5] (2) Cook refusing Wright's request in March or April of 2021 for someone to help her temporarily because she felt behind on her deadlines due to her back issues and chiropractor appointments, even though Cook had advised Wright in the 2020 year-end appraisal to ask for help if Wright needed it;  (3) Cook revoking Wright's alternative work schedule after she asked for assistance with her job duties

---

[5] The court agrees with Wright that she may rely upon Cook's reaction to Wright's back issues as evidence of pretext.  See, Simms v. State of Oklahoma ex rel Dept. of Mental Health and Substance Abuse Services, 165 F.3d 1321, 1328 (10th Cir. 1999) ("Evidence of pretext may include, but is not limited to . . .  prior treatment of the plaintiff.").

and took off for medical treatment for her back issues; (4) Cook indicating to Gonzalez that Wright was "ill and unable to work" in explaining the purpose of revoking the alternative work schedule, (5) Cook seemingly frustrated with Wright for taking off for medical treatment regarding her back issues; (6) Cook seemingly frustrated with Wright after she disclosed that she would have to stay on her heart medication, and remarking "How long is this going to last" or "Is this ever going to end;" (7) Cook rating Wright as "Below Expectations" in the Mid-Year 2021 review even though none of her individual goal ratings were given a rating below expectations and rating Yandell, Rattan, and Myrick, who did not have medical conditions, as "Meets Expectations" even though all had one goal for which they were rated "Below Expectations," and rating them higher than Wright for the exact same level of performance on the "Errors or SOX deficiencies" goal; (8) Cook having no contemporaneous documentation that Wright did not meet all deadlines and expectations in the PIP with respect to the edit reports, salvage billing and aging receivables and unable to identify specific instances of Wright's failure to meet expectations; (9) Cook including the salvage billing tasks in the PIP when they were not listed in the Expectations Document; (10) Cook including the COP tasks in the PIP even though the COP process had changed during Wright's medical leave and she had not been required to perform the new process until the PIP; and (11) Cook requiring Wright to perform the COP tasks in the PIP without accommodation; indicating that an accommodation would be allowed at the end of the PIP, and then terminating Wright. The court concludes that Wright has proffered sufficient evidence to raise a genuine issue of material fact as to whether OGE acted with discriminatory animus when it terminated her employment. The court therefore concludes that summary judgment is not appropriate on Wright's disability discrimination claim.

Retaliation

In one sentence contained in a footnote to its summary judgment motion, OGE posits that Wright cannot assert a retaliation claim under the OADA, citing Edwards v. Andrews, 382 P.3d 1045, 1047 (Okla. 2016).  Doc. no. 46, ECF p. 9, n. 1.  Wright has responded with reasons (and authority) supporting her contention that the Edwards decision does not apply.  OGE has not replied to any of Wright's arguments.  In light of the perfunctory manner the issue has been presented, the court declines to find as a matter of law that Wright cannot assert a retaliation claim under the OADA.  As with the other OADA claims, the court's analysis of the ADA retaliation claim, applying the McDonnell-Douglas framework, will apply to the OADA retaliation claims.

Prima Facie Claim

To establish a prima facie retaliation claim, Wright must show (1) she engaged in activity protected under the ADA; (2) OGE took action against her that an objectively reasonable employee would have found adverse; and (3) a causal connection between Wright's protected conduct and OGE's adverse action to justify inferring that OGE took that action because of Wright's protected conduct.  Aubrey, 975 F.3d at 1015.

a.  Protected Activity

"[A] request for accommodation can constitute protected activity supporting a retaliation claim."  Foster v. Mountain Coal Company, LLC, 830 F.3d 1178, 1188 (10th Cir. 2016).  The request must be "sufficiently direct and specific, giving notice that [the employee] needs a special accommodation."  Id. (quotation marks and citation omitted).  The request need not invoke the "magic words reasonable accommodation."  Id.  But it "must make clear that the employee wants assistance for his or her disability.'"  Viewing the evidence in a light most favorable to Wright,

the court concludes that a reasonable jury could find that Wright asked Cook to provide an accommodation for her disability – for a lighter workload allowing others to assist in performing certain job duties; and (2) giving her more time to complete her duties.

b.  <u>Adverse Action</u>

OGE does not challenge that the termination of Wright's employment constituted adverse action.  The court concludes that a reasonable jury could find that OGE took adverse action against Wright by terminating her employment.

c.  <u>Causal Connection</u>

To establish the causal connection element of the prima facie case, Wright may rely on evidence of close temporal proximity between protected activity and an adverse employment action.  <u>Aubrey</u>, 975 F.3d at 1016 ("[A]dverse action taken in close temporal proximity to protected activity may be considered in establishing causal connection[.]").  Viewing the evidence in a light most favorable to Wright, the court concludes that Wright has proffered evidence sufficient to show temporal proximity.  Wright has proffered evidence that she continued to request a lighter workload by allowing others to assist her and giving her more time to complete her duties after she was placed on the PIP and up until she was terminated.

<u>Legitimate, Non-Retaliatory Reason and Pretext</u>

As with the disability discrimination claim, the court concludes that OGE proffered sufficient evidence of a legitimate, non-retaliatory reason—failure to meets expectations of the PIP.  Therefore, the burden shifts for Wright to show that OGE's reasons for terminating her employment were merely a pretext for retaliating against her for seeking an accommodation for her disability.

<u>Pretext</u>

Viewing the evidence in a light most favorable to Wright, the court concludes that Wright has proffered evidence sufficient to raise a genuine issue of material fact

as to pretext. The court concludes that summary judgment is not appropriate on the ADA retaliation claim.

*Conclusion*

Defendant's Motion for Summary Judgment (doc. no. 46) is **DENIED**.  That said, the court notes, quite readily, that Wright's prospects for success at trial will depend on her prevailing on a litany of issues on which, in this order, she has avoided summary judgment by a paper-thin margin.  A jury could quite easily find, first, that OGE was as patient in coping with Wright's requests as Wright was relentless in making those requests, and, ultimately, that Wright left OGE with no reasonable option other than to terminate her employment.

DATED this 26th day of December, 2024.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

23-0864p021.docx

28